# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RICKY WHITEHEAD and** | ) | |
| **OMAR WILLIAMS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 14 C 1656** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **THOMAS J. DART, in his official capacity,** | ) | |
| **BILQIS JACOBS-EL, in her official** | ) | |
| **capacity, MARTIN MAHONEY,** | ) | |
| **RONALD PECHOTA, MARK DOMICO,** | ) | |
| **and COOK COUNTY MUNICIPALITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

In this action, Ricky Whitehead and Omar Williams ("Plaintiffs") sue Cook County Sheriff Thomas J. Dart ("Dart"), Bilqis Jacobs-El ("Jacobs-El"), Martin Mahoney ("Mahoney"), Ronald Pechota ("Pechota"), Mark Domico ("Domico"), and Cook County, Illinois (collectively "Defendants"), alleging that they were exposed to unduly cold temperatures while housed at the Cook County Jail ("the Jail"). (R. 76, Third Am. Compl.) Defendants now move for summary judgment. (R. 112.) For the reasons stated below, the motion is granted in part and denied in part.

## RELEVANT FACTS

The following facts are undisputed unless otherwise stated. During the winter months of 2013-14, Plaintiffs were pretrial detainees at the Jail and were housed together in Division 9, Cell 3301. (R. 127, Pls.' Resp. to Facts ¶¶ 1-2.) Dart is and was the Sheriff of Cook County during the relevant period. (*Id.* ¶ 3.) Jacobs-El is the Director of the Cook County Department of Facilities Management ("CCDFM"). (*Id.* ¶ 4.) Mahoney and Domico are employed by CCDFM as engineers and during the relevant period were assigned to Division 9 of the Jail. (*Id.* ¶¶ 5-6.)

Pechota is an engineer assistant employed by CCDFM and was also assigned to Division 9. (*Id.* ¶ 7.)

The Jail has policies and procedures in place to address heating, cooling, and ventilation within the Jail. (*Id.* ¶ 8.) One such policy is "Interagency Directive 61.5.2.0," entitled "Response to Abnormal Temperature Conditions in Custodial Areas," which has been in effect since January 2011. (*Id.* ¶ 9.) The directive was the result of an agreed order entered in *United States v. Cook County*, 10 C 2946 (N.D. Ill. May 13, 2010), a lawsuit brought by the U.S. Department of Justice ("DOJ") over conditions at the Jail. In accordance with the agreed order, CCDFM is obligated to "ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling." *Id.*, R. 3-2, Agreed Order § III, ¶ 83(e). The agreed order further provides that CCDFM staff "shall review and assess compliance with this requirement on a daily basis for automated systems and on an annual basis for non-automated systems."[1] *Id.*

Interagency Directive 61.5.2.0 details the relative responsibilities of the Sheriff's Office and CCDFM with respect to addressing abnormal temperatures at the Jail. (R. 127-3, Directive.) The directive defines "abnormal temperature conditions" as "[t]emperatures outside of the normal, acceptable range for well-being." (*Id.* § III(A).) Indoor temperatures are considered abnormal if they are "outside of the range of 68° and 77° Fahrenheit." (*Id.*) Outdoor temperatures are considered abnormal if they are "at or below 10°" or "at or above 85° Fahrenheit." (*Id.*) "Indoor temperature" refers to "[a]ir temperature readings inside facilities as measured by CCDFM." (*Id.* § III(C).) "Outdoor temperature" refers to "readings as provided by the National

---

[1] The Court notes that liability was never determined in the DOJ lawsuit; rather, the order was entered by agreement of all parties. *Cook Cty.*, 10 C 2946, R. 3-2, Agreed Order § VIII(B).

Weather Service for Midway Airport, and monitored by the Executive Director of the [Cook County Department of Corrections ("CCDOC")]." (*Id.* § III(D).)

The directive also contains general notification procedures for temperature problems at the Jail. (*Id.* § IV(A).) Under these procedures, correctional officers who become aware of a temperature problem must notify their watch commander, who in turn notifies the CCDFM divisional engineer by calling a 24-hour call center. (*Id.*) Once the CCDFM receives such notification, it is expected to have a member of the engineering staff "respond to the location to take a temperature reading within an hour." (*Id.* § VII(B).) If temperatures are observed to be outside the acceptable range, "engineering staff shall make every attempt to remedy the situation and bring the temperature within the acceptable range." (*Id.* § VII(C).) If the temperature problem cannot be fixed within 24 hours, CCDFM is required to contact the Sheriff's Office to alert them "so that further action, such as inmate relocation, may be taken." (*Id.* § VII(D).) The Sheriff's Office, in turn, is required to generate an "incident report" whenever an "abnormal temperature condition is verified." (*Id.* § IV(A)(4).) If temperatures fall below 60 degrees, the Sheriff's Office must provide all inmates in the affected area(s) with "warming measures," such as additional blankets, and must move inmates to a warmer area if the problem is not resolved in two hours. (*Id.* § IV(A)(5)-(6).) Sheriff's Office records reflect that five incident reports were filed regarding unduly cold temperatures in Division 9 between November 2013 and January 2014. (R. 132-1, Incident Reports.)

Under the directive, CCDFM engineers are also required to "conduct rounds of CCDOC daily on each of three shifts to ensure indoor temperatures remain in the acceptance range of 68°-77°." (R. 127, Directive § VII(A).) CCDFM has devised a system of compliance with this requirement whereby engineers complete "round sheets" recording the temperature in eight

3

different cells, one of which happens to be Cell 3301—the cell where Plaintiffs were housed during the relevant period. (R. 132, Defs.' Resp. to Add'l Facts ¶ 3.) The Jail also maintains an electronic work order system through which Jail staff can notify CCDFM of issues with indoor air temperatures, although the parties dispute whether the system was adequately utilized during the relevant period. (R. 127, Pls.' Resp. to Facts ¶ 21.) The parties do agree that the system exists, and that CCDFM engineers also conduct routine maintenance on the mechanical system that heats and cools Division 9. (*Id.* ¶ 18.) Between November 2013 and March 2014, CCDFM responded to 45 work orders pertaining to problems with indoor air temperatures within Division 9. (*Id.* ¶ 22.)

On January 27, 2014, Plaintiff Williams submitted a grievance complaining of "freezing temperatures" in his cell and "frost" on the window and walls. (R. 127-9, Williams Grievance Docs. at 2.) The following day, Plaintiff Whitehead submitted a similar grievance complaining that it was so cold there was "ice on the inside of the cell." (R. 127-10, Whitehead Grievance Docs. at 2.) On February 4, 2014, a work order was generated by Michael DeSena, the "work order coordinator" at the Jail and a non-party to this case.[2] (R. 127-9, Williams Grievance Docs. at 3-4.) The work order stated simply that Cell 3301 was "too cold." (*Id.* at 4.) The work order was assigned to Phillip W. Casica, a maintenance supervisor at CCDFM who is also not a party to this lawsuit. (R. 127-11, CCDFM Records; *see also* R. 114-4, Domico Dep. Tr. at 13-14.) CCDFM records reflect that on February 6, 2014, and February 7, 2014, Pechota and two other building engineers (neither of whom are defendants in this case) spent a total of 2.5 hours addressing the problem. (R. 127-11, CCDFM Records.) Their notes reflect that they "adjusted preheat and heating valves . . . to accommodate for colder [outside air] temps," and "re-checked

---

[2] The parties do not clearly identify who this person is, but testimony from various witnesses suggests that DeSena is a correctional officer. (*See* R. 127-12, Morrison Dep. Tr. at 69; R. 114-4, Domico Dep. Tr. at 47-48.)

all for proper temp ranges on 2-7-14." (*Id.*) Their notes also reflect that it was abnormally cold that week, and that on the dates the repairs were made the outside air temperatures were approximately five degrees. (*Id.*)

Daily round sheets completed by Mahoney, Domico, and Pechota from the period January 27, 2014, to February 7, 2014, reflect that the temperature in Cell 3301 never fell below 70 degrees. (R. 127-18, Cell 3301 Round Sheets.) In fact, round sheets submitted by Defendants for the winter months of 2013-14 reflect that temperatures in each of the eight cells that were monitored never went below 70 degrees. (R. 116 & 117, Round Sheets.) The parties vigorously dispute whether these round sheets were properly completed during the relevant period. (*See* R. 127, Pls.' Resp. to Facts. ¶¶ 15-17; R. 132, Defs.' Resp. to Add'l Facts ¶¶ 1-13.)

## PROCEDURAL HISTORY

In March 2014, Plaintiffs brought this action alleging constitutional violations under 42 U.S.C. § 1983. (R. 1, Compl.) After counsel was appointed to the parties engaged in discovery, Plaintiffs filed their third amended complaint naming as defendants Cook County, Dart in his official capacity, Jacobs-El in her official capacity, and Mahoney, Pechota, and Domico in their individual capacities. (R. 76, Third Am. Compl. ¶¶ 7-12.) Plaintiffs allege that from November 2013 to March 2014 they "suffered due to sustained lack of heat in their cell." (*Id.* ¶ 18.) They claim that the cell was so cold that they could see their breath and "their shampoo bottles froze." (*Id.* ¶ 21.) They allege that they repeatedly complained about these conditions but "their complaints essentially went unheeded." (*Id.* ¶ 22.) They claim that there is a widespread problem in Division 9 with adequate heating, and that Sheriff's Office and CCDFM staff members fail to adequately address inmates' complaints about temperature problems. (*Id.* ¶¶ 20-22.) They further allege that although maintenance staff was required to "regularly monitor temperatures in

individual cells," they failed to do so and instead engaged in a "concerted effort to falsify temperature logs . . . for the purpose of manufacturing evidence showing compliance" with the consent judgment entered in the case brought by DOJ. (*Id.* ¶ 19.) In Plaintiffs' view, "the intentional falsification of the temperature logs constitutes malicious, wanton or oppressive acts and a reckless indifference to the constitutional rights of others." (*Id.* ¶ 26.)

Defendants now move for summary judgment on the entirety of the complaint, arguing that Plaintiffs have failed to come forward with evidence establishing that any of them were deliberately indifferent to their right to adequate heating. (R. 112, Mot.; R. 133, Reply.) Plaintiffs object to the entry of summary judgment as to any Defendant. (R. 128, Resp.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [their] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Nor can "speculation and conjecture" defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

In deciding a motion for summary judgment, the Court cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Put simply, "summary judgment cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Instead, the Court's role is simply "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

7

**ANALYSIS**

Because Plaintiffs were pretrial detainees at the time of these events, the Fourteenth Amendment governs their claims regarding the conditions of their confinement. *Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009). The standards governing Eighth and Fourteenth Amendment claims are largely equivalent, however, and "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." *Id.* at 475; *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). Thus, the Court uses Eighth Amendment case law as a "guide" in evaluating a Fourteenth Amendment claim. *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013). "Jail officials violate the Eighth Amendment if they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

A claim by an inmate challenging the conditions of his confinement has two components: an objective prong and a subjective prong. *Farmer*, 511 U.S. at 834; *Burton*, 805 F.3d at 784. 2015). On the objective prong, the Court must determine whether "the alleged conditions were objectively serious enough to amount to a constitutional deprivation." *Burton*, 805 F.3d at 784. It is well settled that inmates have an entitlement to adequate heat and shelter. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016); *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997). Specifically, they have the right "not to be confined in a cell at so low a temperature as to cause severe discomfort." *Dixon*, 114 F.3d at 644 (citation and internal quotation marks omitted). In determining whether a lack of heat amounts to a constitutional violation, the Court must consider a variety of factors, including "not just the severity of the cold" but also its "duration." *Dixon*, 114 F.3d at 643. The Court should also consider "whether the prisoner has alternate means to protect himself from the cold" and "the adequacy of such alternatives." *Id.* at 644. Brief

8

exposures to brutally cold temperatures can amount to a constitutional violation, as can longer exposures to less severe temperatures. *See, e.g.*, *Gillis v. Litscher*, 468 F.3d 488, 490, 495 (7th Cir. 2006) (reversing summary judgment for defendants where plaintiff produced evidence that he was housed in a cell that was unduly cold for three days without any clothing or bedding); *Murphy v. Walker*, 51 F.3d 714, 720-21 (7th Cir. 1995) (reversing dismissal of inmate's claim that he was exposed to mid-November temperatures for more than a week).

On the other hand, the Constitution does not protect against brief exposures to cold temperatures that do not amount to "anything more than the usual discomforts of winter." *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009); *see also Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865, 876 (S.D. Ill. 2009) ("Just because low temperatures force a prisoner to bundle up during the winter does not mean that the prison's conditions violate the Eighth Amendment."). Because of the individual factors at play, determining whether an inmate's exposure to cold rises to the level of a constitutional violation is ordinarily a fact issue that is often "peculiarly appropriate for resolution by the trier of facts." *Dixon*, 114 F.3d at 643.

On the subjective prong, the Court must determine whether "the defendants possessed a sufficiently culpable state of mind." *Burton*, 805 F.3d at 784. "Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015); *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("An official is deliberately indifferent when he is subjectively aware of the condition or danger complained of, but consciously disregards it."). To be held liable, the defendants must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Farmer*, 511 U.S. at 837. By the same token, "[a] plaintiff need not

prove that his complaints were literally ignored" by the defendants, but may also prevail if he establishes that "defendants' responses . . . were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Haywood v. Hathaway*, ---F.3d---, 2016 WL 6988750, at *3 (7th Cir. Nov. 29, 2016) (citation, internal quotation marks, and alteration omitted). However, "[n]egligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough." *Burton*, 805 F.3d at 785 (citation omitted). Instead, the deliberate indifference standard "approaches intentional wrongdoing" and is comparable to "criminal recklessness." *Id.* at 784. If the defendants "don't know" about the problem or "can't do anything about it, the subjective component is not established." *Del Raine v. Williford*, 32 F.3d 1024, 1038 (7th Cir. 1994) (citation omitted).

## I.     Objective Prong

Defendants first argue that Plaintiffs' claim fails on the objective prong. (R. 113, Mem. at 4-5.) Defendants believe that the round sheets definitively prove there were no temperature problems at the Jail during the period in question, and that temperatures in Plaintiffs' cell "never fell below 68 degrees Farenheit." (*Id.* at 4.) In their view, Plaintiffs have no "objective evidence" to prove that "they were exposed to 'freezing cold' temperatures" during this period. (*Id.*)

Construing the record in Plaintiffs' favor and affording them every favorable inference, the Court finds sufficient evidence for a reasonable jury to conclude that they were exposed to unduly cold temperatures in violation of their constitutional rights. For unknown reasons, Plaintiffs did not submit their own deposition testimony or affidavits in opposition to the motion for summary judgment. But there is other evidence in the record supporting their claim. One of Defendants' Rule 30(b)(6) witnesses, James Morrison, testified that there were approximately 40 instances of abnormally low temperatures occurring in Division 9 during the winter months of

2013-14. (R. 127-12, Morrison Dep. Tr. at 26.) Jail records also show that in late January 2014 Plaintiffs separately complained of temperatures in their cell that were so cold they could see their breath and their shampoo bottles froze. (R. 127-9, Williams Grievance Docs.; R. 127-10, Whitehead Grievance Docs.) Jail records show that a work order was issued for that cell on February 4, 2014, and that CCDFM maintenance staff spent a total of 2.5 hours repairing some type of problem with the heating system in response. (R. 127-11, Work Order.) CCDFM staff acknowledged that if in fact the temperatures in the cell were comfortable, there would have been no need to make any repairs. (R. 127-2, Nolan Dep. Tr. at 39-41.) The record reflects that outside air temperatures were extremely cold during this period (in the single digits), suggesting that even a slight problem with the heating system could cause indoor temperatures to drop. (*See* R. 127-11, CCDFM Records at 2.) It is also notable that Plaintiffs were in a cell with two exposed walls which happened to be at the farthest point from the main heating fan in Division 9. (R. 114-4, Domico Dep. Tr. at 23.)

Although the round sheets submitted by Defendants reflect that indoor air temperatures at the Jail were not unduly cold during this period, the Court finds the other evidence sufficient to create a fact dispute over whether Plaintiffs were exposed to cold temperatures that caused them severe discomfort. *See Dixon*, 114 F.3d at 644. The exact severity and duration of Plaintiffs' exposure to the cold, and the sufficiency of any other means of warmth provided to them, are matters that must be determined by the jury. *See id.* at 643; *Murphy*, 51 F.3d at 720-21; *see also Gillis*, 468 F.3d at 494 ("Because of competing facts and inferences in this case, whether Gillis was denied the 'minimal civilized measure of life's necessities' [due to exposure to the cold] cannot be determined on summary judgment."). Accordingly, the Court finds that Plaintiffs have satisfied the objective prong.

## II.    Subjective Prong

On the subjective prong, Defendants argue that there is insufficient evidence that any Defendant was deliberately indifferent to Plaintiffs' right to adequate heat. (R. 113, Mem. at 6-10.) The Court addresses separately below the building engineers and the high-level officials.

### A.    Pechota, Domico, and Mahoney

To prove that building engineers Pechota, Domico, and Mahoney were deliberately indifferent to their right to adequate heating, Plaintiffs must show that these individuals were subjectively aware that a substantial risk of serious harm existed but consciously disregarded that risk. *Perez*, 792 F.3d at 776-77; *Rice*, 675 F.3d at 664. As to Pechota and Domico, the Court agrees that Plaintiffs have not come forward with sufficient evidence on the subjective prong. The Court again notes that Plaintiffs did not supply the Court with their own testimony or affidavits, and there is nothing else in the record to reflect that they personally complained to Pechota or Domico about the lack of adequate heat in their cell. Their grievances reflect that they complained to unnamed correctional officers who are not parties to this lawsuit. (R. 127-9, Williams Grievance Docs. at 2; R. 127-10, Whitehead Grievance Docs. at 2.) There is nothing in the record to reflect that these unnamed correctional officers notified Pechota or Domico of any problem with the heat in Plaintiffs' cell. The record reflects that Plaintiffs' grievances were sent to a non-party, DeSena, who generated a work order on February 4, 2014. (R. 127-9, Work Order at 4.) The work order was assigned to CCDFM employee Casica, who is also not named as a defendant. (R. 127-11, CCDFM Records at 2.)

There is nothing in the record to reflect that Domico was ever made aware of Plaintiffs' complaint about their cold cell. Pechota obviously became aware of Plaintiffs' complaint because he performed work to address the heating problem on February 6, 2014, and February 7,

12

2014. (R. 127-11, CCDFM Records at 2.) But there is nothing in the record to suggest that he was aware of the problem any earlier than February 6, 2014, the date he began work to repair the problem, or that he otherwise unduly delayed in responding to Plaintiffs' complaint. CCDFM records also reflect that in addition to performing work on the system on February 6, 2014, Pechota returned to the area on February 7, 2014, and "rechecked all for proper temp ranges." (*Id.*) The fact that Pechota took steps to address the heating problem in Plaintiffs' cell shows "the opposite of deliberate indifference." *Hagemann v. Schmitz*, No. 10-C-026, 2011 WL 38996, at *5 (E.D. Wis. Jan. 5, 2011); *see also Moore v. Monahan*, No. 06 C 6088, 2009 WL 310963, at *7 (N.D. Ill. Feb. 9, 2009), *aff'd in part*, 428 F. App'x 626 (7th Cir. 2011) (granting summary judgment for defendants who "took reasonable measures to abate the cold"); *Dace*, 658 F. Supp. 2d at 877-79 (finding no deliberate indifference where correctional officers forwarded plaintiff's complaint about inadequate heating to maintenance staff, who spent several hours repairing a problem with the heating system).

Although Jail records reflect that Plaintiffs complained to correctional staff again in March 2014 that their cell was cold, there is nothing before the Court to suggest that these complaints were ever forwarded to Pechota or Domico, or that these Defendants were otherwise aware of a new (or continuing) problem with the heating in Plaintiffs' cell. (*See* R. 127-9, Williams Grievance Docs. at 3; R. 127-10, Whitehead Grievance Docs. at 3.)

Plaintiffs make much of the fact that Pechota and Domico were completing daily rounds during this period and that their round sheets reflect that temperatures in Cell 3301 were always at least 70 degrees. (R. 128, Resp. at 8-17.) Plaintiffs find these readings preposterous, and argue that Defendants' failure to measure cell temperatures in accordance with the Interagency Directive shows they were deliberately indifferent to inmates' heating needs. (*See id.*) It is worth

noting that the Interagency Directive does not actually *require* CCDFM building engineers to measure temperatures daily in any individual cell or area of the Jail; rather, it requires CCDFM generally to "conduct rounds of CCDOC daily on each of three shifts to ensure indoor temperatures remain at the acceptable range."[3] (R. 127-3, Directive § VII(A).) As far as the record reveals, the daily check of individual cells is simply the manner CCDFM devised to try to comply with the Interagency Directive.

But even if the Interagency Directive did require temperatures to be measured in specific cells, this case is not about whether CCDFM is complying with an administrative regulation or a consent decree entered in another case. By focusing so heavily on whether the round sheets were accurately completed, Plaintiffs appear to be conflating the technical requirements of the directive with what is required by the U.S. Constitution. This case is about whether two individual inmates were denied the minimal civilized measure of life's necessities—namely, adequate heat—in violation of the Fourteenth Amendment. Resolving this constitutional claim requires the application of federal constitutional standards, and whether Defendants complied with a municipal policy or regulation is of little relevance. *See Sobitan v. Glud*, 589 F.3d 379, 389 (7th Cir. 2009) ("By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right." (citation omitted)); *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (observing that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations and [] practices"); *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) ("A violation of a state statute is not a per se violation of the federal Constitution. The federal government is not the enforcer of state law.").

---

[3] One witness explained that the CCDOC is essentially a "compound" that includes several different buildings including the Jail. (*See* R. 114-4, Domico Dep. Tr. at 22.)

Plaintiffs argue vigorously that there was a widespread practice of falsifying temperature records, but as to any specific wrongdoing by Pechota and Domico that might demonstrate deliberate indifference, the Court finds Plaintiffs' evidence lacking. Both of these Defendants testified that they make regular rounds and use a temperature sensor to physically measure ambient temperatures in each location. (R. 114-4, Domico Dep. Tr. at 9-25; R. 114-6, Pechota Dep. Tr. at 10-11, 31-41.) It was clear from their testimony that they cannot always get into a particular cell for security reasons, but in such instances they place the temperature sensor through a "grate" in the door and measure the temperature that way. (R. 114-4, Domico Dep. Tr. at 14-15; R. 114-6, Pechota Dep. Tr. at 34.) It is also clear that the process was not perfect because the sensor only measures the ambient temperature and not the surface temperature of floors, walls, or windows. (R. 114-4, Domico Dep. Tr. at 15.) But the testimony of these witnesses was that they performed their duties on a daily basis and that to their knowledge the temperatures reflected in the logs were generally accurate. (R. 114-4, Domico Dep. Tr. at 9-25; R. 114-6, Pechota Dep. Tr. at 10-11, 31-41.)

In response, Plaintiffs point to testimony from a correctional officer named Darral Alexander, who testified that he did not personally witness CCDFM staff conducting daily rounds to measure temperatures in the cells. (R. 127-14, Alexander Dep. Tr. at 16.) Alexander, who is not named as a defendant, also agreed with Plaintiffs' counsel's characterization that the temperature logs were not "plausible." (*Id.* at 44-45, 53-54.) But the brief excerpt of his deposition that has been submitted does not explain what Alexander's job duties were, where he was stationed within the Jail, or why he would have been in a position to see the comings and goings of every individual staff member on a daily basis. (*See id.*) The excerpted testimony also does not explain why this officer did not find the logs "plausible," whether he ever actually

measured the temperatures in any of these areas, or whether he had personal knowledge of an incident involving unduly cold temperatures inside Plaintiffs' cell or elsewhere that was not adequately addressed. The mere fact that this one particular correctional officer did not see maintenance staff conducting daily rounds does not necessarily contradict the testimony of Pechota and Domico that they conducted rounds each day at some point during their eight-hour shifts. (*See* R. 114-4, Domico Dep. Tr. at 21-22, 25; R. 114-6, Pechota Dep. Tr. at 10-11.) In addition, Alexander made other statements suggesting that CCDFM building engineers were *not* deliberately indifferent to the heating needs of detainees: He testified that he regularly saw building engineers in the cells measuring temperatures with a sensor whenever he or others reported a problem with the heating. (R. 127-4, Alexander Dep. Tr. at 16-17.) Based on the record, there is insufficient evidence from which a reasonable jury could conclude that Pechota or Domico were subjectively aware of the lack of heat in Plaintiffs' cell and consciously disregarded the risk posed by this condition. Therefore, these two Defendants are entitled to summary judgment.

Mahoney presents a slightly different situation. Unlike Pechota and Domico, he did not testify that he actually went to individual cells to measure the temperatures; he acknowledged that he did not go the cells because he worked the night shift and cell areas were locked down during this period. (R. 114-5, Mahoney Dep. Tr. at 10-11.) Instead, he testified that he made daily rounds to each tier of the Jail to "feel for the temperatures" and to measure the temperature of the dayroom on each floor. (*Id.*) From a basement control room, he also examined the discharge air temperature going into the cells as well as the temperature of the air returning from a group of cells. (*Id.* at 28-37.) From those findings he would make an "estimate" of the ambient temperature in each cell. (*Id.* at 31-42.) Mahoney acknowledged, however, that some days he did

not make his rounds at all (depending on whether he was assigned to address an emergency in another building), yet he still filled out the round sheets as if he had done so. (*Id.* at 47.)

Mahoney's testimony certainly draws into question the accuracy of the temperature logs, but again, the failure of maintenance staff to physically measure the temperature in eight different cells does not, by itself, amount to a constitutional violation. Mahoney might have been unprofessional or negligent in the execution of his duties,[4] but there is nothing in the record to show that he was *subjectively aware* of a problem with the heating in Plaintiffs' cell and consciously disregarded it. Negligence, even gross negligence, is not enough to establish a constitutional violation. *Burton*, 805 F.3d at 785. If anything, the fact that Mahoney did not go into each individual cell while conducting daily rounds suggests that he would not have been aware that the temperature was unduly cold. *See Del Raine*, 32 F.3d at 1032 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.") (citation omitted)).

As with Pechota and Domico, there is also nothing in the record to reflect that either of the Plaintiffs complained to Mahoney directly, nor is he mentioned anywhere in their grievance forms, the work order that was generated, or CCDFM's records documenting the work that was done to repair the problem in Plaintiffs' cell. Even affording Plaintiffs every favorable inference, they have failed to come forward with anything more than "speculation and conjecture" about Mahoney's knowledge regarding their heating problem. *Cooney*, 735 F.3d at 519. The Court finds insufficient evidence from which a reasonable jury could conclude that Mahoney was

---

[4] There is no evidence in the record, such as from an expert on heating and ventilation systems, suggesting that measuring discharge and return air temperatures is an inadequate way to measure the temperature in a particular area, and so the Court offers no judgment about whether Mahoney acted inappropriately in measuring temperatures as he did.

deliberately indifferent to Plaintiffs' right to adequate heating during the relevant period. He, too, is entitled to summary judgment.

### B.    Dart, Jacobs-El, and the County

Unlike the building engineers who are sued in their personal capacity, Plaintiffs raise official capacity claims against Dart, Jacobs-El, and the County pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).[5] (*See* R. 78, Third Am. Compl. ¶¶ 7-12.) Under *Monell*, municipal entities or officials cannot be held liable simply because they employ individuals who engage in wrongdoing. *See Monell*, 436 U.S. at 691; *Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002). Instead, for liability to attach, a plaintiff must show that the municipality *itself* caused or participated in the deprivation of his or her constitutional rights. *Monell*, 436 U.S. at 694; *see also League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 727 (7th Cir. 2014) (observing that a *Monell* claim is viable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" (quoting *Monell*, 436 U.S. at 694)).

There are three means of establishing liability under *Monell*. A municipality may be held liable "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). There is no "bright-line"

---

[5] "An official capacity suit is the same as a suit against the entity of which the officer is an agent." *DeGenova v. Sheriff of DuPage Cty.*, 209 F.3d 973, 974 n.1, 976 n.2 (7th Cir. 2000); *see also Monell*, 436 U.S. at 690 n.55 ("[O]fficial-capacity lawsuits generally represent . . . another way of pleading an action against an entity of which an officer is an agent."). Although there is some redundancy in naming both the County and Sheriff Dart in connection with a *Monell* claim, Plaintiffs' complaint suggests that they named the County only for indemnification purposes in the event that Sheriff Dart is held liable. (R. 76, Third Am. Compl. ¶ 9.) The Court will therefore permit the County to remain as a Defendant.

rule defining what constitutes a "widespread custom or practice," but at a minimum it requires

more than one instance of misconduct, and likely more than two or three instances. *Id.* This

requirement is meant to ensure "that there is a policy at issue rather than a random event." *Id.* In

effect, the plaintiff must show that the unlawful practice "was so pervasive that acquiescence on

the part of policymakers was apparent and amounted to a policy decision." *Daniel v. Cook Cty.*,

833 F.3d 728, 734 (7th Cir. 2016) (citation omitted).

In order to show that the alleged custom or practice was attributable to the municipality

"and thus had the force of law," the plaintiff must show that municipal policymakers were

"deliberately indifferent as to [its] known or obvious consequences." *Gable*, 296 F.3d at 537

(citation omitted). "The Supreme Court has defined deliberate indifference in this context to

mean that a reasonable policymaker would conclude that the plainly obvious consequences of the

[municipality's] actions would result in the deprivation of a federally protected right." *Id.*

(citation, internal quotation marks, and alteration omitted). The plaintiff must also establish

causation—that the unlawful policy or custom was the "moving force" behind the violation of

his constitutional rights. *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir.

2007) (citation omitted).

Defendants argue that the remaining Defendants are entitled to summary judgment, in

essence, because the Jail and CCDFM had policies and procedures in place for addressing

problems with cold temperatures. (R. 113, Mem. at 6.) Defendants point out that there were

approximately 45 work orders completed during the relevant period based on inmate complaints,

and also that Sheriff's Office staff filed five instances of abnormal temperatures during this

period. (*Id.*) In Defendants' view, this shows that the systems in place were working and that all

temperature problems were adequately addressed. (*Id.*) They further argue that the work orders

19

and routine maintenance performed by CCDFM staff establishes that CCDFM was not deliberately indifferent to the heating needs of inmates. (*Id.* at 7.)

Affording Plaintiffs every favorable inference, the Court agrees with Plaintiffs that factual disputes preclude the entry of summary judgment for these Defendants. It bears repeating that an inmate need not show that he was "literally ignored" to establish a constitutional violation; he can also prevail by showing that the defendants' responses to his complaint were "plainly inappropriate" under the circumstances. *Haywood*, 2016 WL 6988750, at *3. Although the record does in fact show that reports were filed and work performed on the heating system during the relevant period, Plaintiffs have also submitted evidence to suggest that not enough was done to provide inmates with adequate heating during winter 2013-14.

As to Plaintiffs, there is evidence that they were left in an unduly cold cell for at least a week before needed repairs were made despite their repeated complaints. (R. 127-9, Williams Grievance Docs; R. 127-10, Whitehead Grievance Docs.; R. 127-11, CCDFM Records.) Plaintiffs have also submitted evidence of at least four other instances where inmates in Division 9 were left in extremely cold temperatures during this period and Defendants' responses were unduly delayed or inadequate. [6] (*See* R. 127-8, Anderson Grievance Docs.; R. 127-15, Lewis Grievance Docs.; 127-16, Shepard Grievance Docs.; R. 127-17, Haynes Grievance Docs.) For instance, an inmate in Division 9 complained on January 6, 2014, that he had been in a cell with a broken window for more than month; he estimated that the temperature in his cell was "below 20 degrees." (R. 127-8, Anderson Grievance Docs. at 2.) He stated that he had been complaining

---

[6] Defendants object that Plaintiffs are relying on "inadmissible hearsay" regarding the complaints of the other inmates. (R. 132, Defs.' Reply to Add. Facts ¶ 21.) Under Rule 56, materials submitted in support of summary judgment are not objectionable unless they "cannot be submitted in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). The accounts of these inmates would be admissible at trial through their own testimony, and the Court therefore declines to discount this evidence. Defendants also move to strike several of Plaintiffs' proposed facts that are premised on verbatim quotes of deposition testimony as "mischaracterizing" the testimony or improperly arguing a "legal conclusion." (*See, e.g.*, R. 132, Defs.' Reply to Add. Facts ¶¶ 9-15.) The Court finds no merit to such objections but has nevertheless considered the quoted testimony in the context of the entire record.

to correctional officers and sergeants repeatedly but nothing was done. (*Id.*) This inmate was ultimately moved to a different cell, but not until four days after he filed a formal grievance. (*Id.* at 3.) Similarly, another inmate complained in late January 2014 that for the past month his cell had been "unbearably cold" and that he had been complaining to "every officer on every shift" but nothing was done. (R. 127-17, Haynes Grievance Docs. at 2.) Records reflect that more than a week passed before this inmate was moved to another cell and a work order issued for the heating problem. (*Id.* at 4.) It bears repeating that this was January in Chicago and outdoor temperatures were extremely cold—in fact, during the winter of 2013-14 temperatures were abnormally cold even for Chicago. *See Collins v. Magana*, No. 14 C 5083, 2015 WL 7731840, at *1, *4 (N.D. Ill. Dec. 1, 2015) (describing the "polar vortex" that occurred during the winter of 2013-14, which resulted in "bitterly cold" temperatures in Illinois).

Although it is reasonable to infer from the record that there were delays in addressing heating complaints made by inmates, it is not entirely clear whether the problem lies with the Sheriff's Office, CCDFM, or both. The facts surrounding Plaintiffs' heating problem provide but one example. Both Plaintiffs noted in their grievances that they had been complaining to correctional staff on their tier about the cold temperatures for nearly a week and yet nothing was done in response to the problem. (R. 127-9, Williams Grievance Docs. at 2; R. 127-10, Whitehead Grievance Docs. at 2.) When they filed formal grievances some action was finally taken, but it appears from the record that a work order was not generated by Jail staff until approximately five days after the grievances were filed. (R. 127-9, Williams Grievance Docs. at 3; R. 127-10, Whitehead Grievance Docs. at 3.) The work order was then assigned to CCDFM, but another two days passed before engineers were sent to assess and correct the problem. (R. 127-9, Williams Grievance Docs. at 4; R. 127-11, CCDFM Records at 2.) Then in March 2014,

both Plaintiffs filed grievance appeals stating that they were still having problems with the temperatures. (R. 127-9, Williams Grievance Docs. at 3; R. 127-10, Whitehead Grievance Docs at 3.) Williams's grievance appears not to have made it out of the Jail, as a correctional officer denied the appeal stating simply, "Response stands." (R. 127-9, Williams Grievance Docs. at 3.) Whitehead's appeal reflects that it was "redirected to Facilities Management," but there is nothing in the record to reflect what, if anything, CCDFM staff did in response. (*See* R. 127-10, Whitehead Grievance Docs. at 3.)

Although it is difficult to discern exactly who was to blame for the delays and deficiencies, this is not uncommon in prison condition cases, nor is it fatal to a *Monell* claim: When "an institution structure[s] its affairs so that no one person was responsible for the inmate's care . . . such diffused responsibility can make it very difficult to show individual responsibility." *Daniel*, 833 F.3d at 734 (citation, internal quotation marks, and alteration omitted). But it is clear from the record that Dart and Jacobs-El shared joint responsibility for ensuring inmates received adequate heat, (R. 127-3, Directive), and there are numerous fact disputes regarding whether adequate heat was provided during the relevant period.

Defendants point to the temperature logs and incident reports that were filed as evidence that appropriate steps were taken, but given the other evidence in the record, these are not enough to carry the day. As explained above, regardless of whether there was any intentional falsification, Plaintiffs have submitted evidence drawing into question the accuracy of the temperature logs. The record reflects that some of the temperature measurements were not taken in the cells at all, and others only reflect the ambient temperature right inside the cell door, even though temperatures near outer walls or windows could be significantly colder when outside air temperatures were bitterly cold. (*See* R. 114-5, Mahoney Dep. Tr. at 10-36; R. 114-6, Pechota

Dep. Tr. at 34.) Indeed, on the date that repairs were made to the heating in Plaintiffs' cell, the temperatures were recorded on the round sheets as being around 75 degrees. (R. 127-18, Cell 3301 Round Sheets at 33-36.) Presumably there would have been no need to make any repairs if the temperatures in the cell were indeed that comfortable.

As for the incident reports, they do in fact show that some action was taken by Jail staff to remedy heating problems on five separate occasions during the relevant period. (R. 132-1, Incident Reports.) But even as to these incidents, fact disputes exist regarding whether the actions taken were prompt and adequate.[7] Additionally, Defendants' Rule 30(b)(6) witness testified that there were approximately 40 incidents of abnormally cold temperatures in Division 9 during this period. (R. 127-12, Morrison Dep. Tr. at 26.) What action, if any, was taken in response to these other 35 incidents of unduly cold temperatures, and why no incident reports were filed regarding these other incidents remains unclear.

Viewing the record as a whole, the Court finds sufficient evidence from which a reasonable jury could conclude that Plaintiffs were subjected to unduly cold temperatures at the Jail due to a widespread practice or policy by CCDFM and/or Jail staff of responding to temperature complaints in a delayed or inadequate fashion. *See Haywood*, 2016 WL 6988750, at *4 (reversing grant of summary judgment where plaintiff produced evidence that jail's response

---

[7] For instance, one such incident occurred in Division 9 in late November 2013. (*See* 132-1, Incident Reports.) Plaintiffs have submitted tweets from Dart's Twitter account regarding the heating problem that occurred during this period. (R. 127-7, Tweets at 2-7.) Although Dart stated in the tweets that all affected inmates had been relocated and that the problem was resolved later that same day, a community activist responded that she was still receiving reports from family members of inmates that the heat was not repaired and that inmates had not been moved out of affected areas. (*Id.* at 4-7.) She asked Dart, "Why the conflicting information?" but he did not respond to her tweets. (*See id.* at 7.) There is other evidence that an inmate in Division 9 complained during this period that he was kept in a cold cell for approximately two weeks before the problem was repaired. (*See* R. 127-12, Morrison Dep. Tr. at 80-81.) The Court also notes that a log book that is supposed to be used by CCDFM to record "unusual occurrences" with the Jail's heating system did not contain any reference to the November 2013 incident, even though Dart's tweets suggest that a significant malfunction of the heating system occurred. (*See* R. 127, Pls.' Resp. to Facts ¶¶ 20-21.) This raises an inference that the log book does not provide a complete picture of heating problems that occurred at the Jail during the relevant period.

to heating problem was "plainly inappropriate" given the extremely cold temperatures); *Daniel*, 833 F.3d at 735 (reversing grant of summary judgment for defendant on *Monell* claim where evidence raised a genuine issue of material fact regarding whether plaintiff's injury resulted from "systemic, gross deficiencies" in jail's medical care system); *Dixon v. Cty. of Cook*, 819 F.3d 343, 348-49 (7th Cir. 2016) (concluding that fact issues regarding whether systemic deficiencies in jail's medical records system caused detainee's injury precluded the entry of summary judgment for the defendants); *Thompson v. Taylor*, No. 13 C 6946, 2016 WL 5080484, at *9 (N.D. Ill. Sept. 20, 2016) (finding that "gaps in the prison's practices for treating inmate dental injuries raise a sufficient question for the jury as to Cook County's liability" under *Monell*). Thus, the motion for summary judgment is denied as to the remaining Defendants.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (R. 112) is GRANTED in part and DENIED in part. Judgment is ENTERED in favor of Defendants Ronald Pechota, Mark Domico, and Martin Mahoney. The motion is DENIED in all other respects. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all efforts to settle the case. The parties shall appear for a status hearing on January 4, 2017, at 9:45 a.m. to discuss outstanding matters in preparation for the jury trial scheduled to begin on January 17, 2017.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: December 14, 2016**

24